13200

STONE v. SCHOOL DISTRICT No. 17, GREENVILLE COUNTY ET AL.

(159 S. E., 536)

250

*Messrs. H. C. McKnight, R. G. Stone* and *William G. Sirrine,* for appellant,

*Messrs. Haynsworth & Haynsworth,* for respondents,

July 14, 1931.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

The petitioner, Stone, claiming ownership of, and title to, a certain parcel of land in the City of Greenville, brought action in the Court of Common Pleas of the County of Greenville to restrain the respondents, school district and the trustees thereof, from using, occupying, and trespassing thereon. The alleged trespasses consisted of the grading of the lot and removing soil therefrom, and the use of the same as a playground for the children who attended the school situate on an adjoining lot.

By way of return to a rule to show cause issued by his Honor, Circuit Judge Mauldin, the respondents alleged, briefly stated, that prior to March 30, 1923, Stone was the owner of considerable undeveloped property near the northern limits of the City of Greenville; that Stone, learning that the school trustees were contemplating the erection of a school building in that section, offered to sell to the school district a certain lot of land for the purpose of a school lot, and at the time pointed out to the trustees the lines and boundaries of the lands proposed to be sold by him, and such lands pointed out included the parcel described in the petition; that the trustees, relying upon the acts and declarations of Stone relative to the boundaries, agreed to purchase the land from him, and immediately graded and improved it and erected a school building thereon; that Stone witnessed the improvements being made by school district and made no protest; that the school district paid a full price for the property and has been in possession of the whole lot, including the lot claimed by Stone, since the time of the purchase in 1923, without any complaint until a very recent date on the part of Stone; that had it been known that the property sold by Stone did not include the lot referred to in his petition, the school trustees would have refused to purchase the same and would have located the school elsewhere; that Stone, by his acts, declarations, and statements, was estopped

from claiming that the lines formerly pointed out by him were not true and correct. Respondents prayed the Court that if it should be determined that the lot referred to in the petition was not included in the lines of the deed executed by Stone to the school trustees, that the deed should be reformed so as to express the true contract between Stone and the trustees.

By consent of the parties, the cause was referred generally to the Master of Greenville County, who found, and reported to the Court, in favor of the claims of the respondents. Upon exceptions to that report on the part of the petitioner, the conclusions of the Master were approved by his Honor, Circuit Judge Dennis, who, in his order, directed a reformation of the deed so as to include therein certain lands described later.

The petitioner, Stone, has appealed from the circuit decree to this Court. Here, we shall refer to him as he was styled in the lower Court, "the petitioner," and will give the respondents the same nomenclature they had there.

The cause is one in equity, and, accordingly, it is our duty not only to pass upon the legal issues, but we are to determine the questions of fact. In reaching conclusions as to the facts, we are not unmindful of the rule so often announced by this Court that it is the duty of the petitioner (as appellant) to convince us that there was error in the findings of the Master, concurred in by the Circuit Judge. As briefly as we can, but with due regard to our duty to fairly state the evidence adduced at the hearing before the Master, we undertake a statement of the facts.

Both in the statement of facts and in the brief of the appellant, it appears that the disputed lot of land is a strip 58 feet in width. A full examination of the record causes us to think, however, that this is an error and that the width is only 50 feet. The Master, in his report, referred to the land as a "50-foot lot." In his decree, the Circuit Judge places the width at 50 feet. The confusion on the part of

the appellant's counsel is due, perhaps, to the fact that he has added to the 50 feet, contended for by him, 8 feet of a 16-foot alley.

We note also in the petition, appearing in the transcript, what is evidently an erroneous description of the lot. The description appearing in the decree has the appearance of being correct, and we shall follow that. We may add, however, that the contradictory and confusing statements do not really affect our determination of the cause.

The facts appearing to be undisputed are as. follows: In the division of the "Stone property," lying near the northern limits of the City of Greenville petitioner came into ownership of certain lots, of which the parcel in question was included. The lots are represented on what is termed the "Stone plat," filed and recorded in the office of the register of mesne conveyances of Greenville County some twenty years ago. Exhibit 3 in the transcript of record shows as much of these lots as is necessary for an understanding of this case, and it, with the description contained in the deed of Stone to the school trustees, will be reported.

On the plat, it is to be observed that Wilton Street runs north and south, while Randall and Croft Streets run east and west.

Prior to and at the time Stone and the school trustees were negotiating for land, H. K. Townes, Esq., owned parts of lots 31 and 33, indicated on the plat by dotted lines. His lot fronted on Wilton Street, south of the corner of Wilton and Randall Streets, for 108 feet, and ran back from Wilton Street parallel to Randall Street for a distance of 187 feet. The Townes lands were bought by the trustees for school purposes about the same time the trade was made with Stone.

Stone owned the remainder of lots 31 and 33, and all of lots 32, 35 and 36.

Stone did not own lot No. 34, which lot, it seems, belonged to Mrs. Miller. The City of Greenville purchased that lot about three years after Stone's deed was made, and

about the same time purchased from Stone lot 36. The purchases of these lots were made by the city, it appears, for the use of the school.

By reference to the description in the deed, it will be seen that Stone conveyed to the school trustees in 1923 the portions of lots 31 and 33 owned by him, lot 35 and one-half of the 16-foot alley lying between lots 31, 33 and 35 on the north, and lots 32, 34 and 36 on the south. The deed described only 100 feet on Wilton Street, but including the one-half of the alley the line there measured 108 feet.

A few days before the execution of the deed, in the negotiations for the schoolhouse lot, the property was visited by Stone and a committee of the school trustees composed of George W. Sirrine, who died before the institution of this cause, Richard F. Watson, and Kerr Wilson. Later, and before the execution of the deed, it appears that all the trustees, in the absence of Stone, visited the property. The contention of the respondents is largely based upon what happened on the inspections at the times of these visits.

The description of the conveyed property, as contained in the deed, did not include the lot in dispute. The disputed area is a lot beginning in the center of the 16-foot alley on the east side of Wilton Street and running thence with Wilton Street in a southerly direction for 50 feet, thence in a line parallel with Randall Street in an easterly direction for 131 feet, thence in a northerly direction in a line parallel with Wilson Street for 50 feet, thence in a westerly direction parallel with Randall Street 131 feet to point of beginning. In other words, the respondents claim, and the petitioner denies, that Stone's deed should have included 8 feet of the southern side of the alley between lots 31 and 32, and 42 feet, all the way across, into lot 32.

We turn now to the disputed facts between the parties. The respondents endeavored by the testimony of Messrs. R. F. Watson, Kerr Wilson, E. M. Blythe, and M. L. Marchant, members of the board of trustees of the school district

at the time of the negotiations with Stone, to sustain their claim.

The testimony of Messrs. Blythe and Marchant, as to what occurred on the visit of those gentlemen with the other trustees, was, in the main, incompetent, for the reason that the petitioner, Stone, was not present at the time, and there is nothing in the record to show that any one who was present had authority to act or speak for him. The understanding that these witnesses had as to the lines of the property to be conveyed to the school district came to them from other members of the board, not from Stone. The gentlemen who gave the information were members of the board of trustees, and were acting in that capacity when they pointed out the lines, or supposed lines, to Messrs. Blythe and Marchant. We think the Master and the Circuit Judge should have disregarded the testimony of Messrs. Blythe and Marchant, which was timely objected to by the petitioner, and, in our consideration of the case, we have pursued that course.

The testimony of Messrs. Watson and Wilson, as to the acts and declarations of Stone in pointing out the lines of the land to be conveyed, was competent. These gentlemen testified that Mr. Stone, in showing Mr. Sirrine and them the lands to be conveyed to the school district, made no reference to frontage, but that he pointed out the boundaries of the lands he proposed to convey; and that the southern boundary, indicated by him, was a "hedge row," about 15 or 20 feet north of a small dwelling house located on lot 32. (This dwelling and the dwelling house now occupied by Stone on lot 32 do not appear on the plat to be reported.) The boundaries designated according to these witnesses, would include the disputed lot of land. It is upon this testimony that the respondents mainly depend, and must depend, to support their contention.

As additional support of their cause, the respondents attempted to show that the petitioner knew, or certainly must

have known, for some time before the institution of his suit, that the school district was not only claiming the property in dispute, but that it was in actual possession thereof, and because of the silence and failure to protest on the part of the petitioner, he is estopped to now claim any right to the disputed land. To sustain this position, it is pointed out that Stone admitted that he had seen the grading going on.

In answer to the evidence depended upon by the respondents, the petitioner offered the testimony of himself, three of his brothers, T. C. Stone, R. G. Stone, and C. R. Stone, and H. C. McKnight, to the effect that Messrs. Wilson and Watson were mistaken as to the location of the "hedge row"; that there was no "hedge row" in the neighborhood of the southern line of the lot to be conveyed to the school district by Stone, and the only "hedge row" in that vicinity was several hundred yards away, down near Croft Street; and if the southern line of the lot to be conveyed was a "hedge row," the respondents would have obtained not only a part of lot 32, but the whole of that lot, which was much more land than they contend for. All of these witnesses, it appears, were much better acquainted with the lands than the witnesses for the respondents. All four of the Stones had lived on the lands, and Mr. McKnight, living near by, had visited the place often, using it for a recreation ground for himself and his sons, and many times had gathered persimmons from a tree growing close by.

As to the grading alleged to have been seen by Mr. Stone, he explained that while that was going on he was living at Marietta, some fifteen miles from Greenville, and only upon two or three occasions during those years had he passed the school lot, that while he had seen some grading being done, it did not occur to him that the respondents were exercising more than their right to grade the lands he had conveyed to them, and at no time during those days did he think they were trespassing upon his other land. The petitioner further testified, and there seems to be no contradic-

tion of the fact, that during this time his eyesight was very defective, almost to the point of blindness, and unless he had gone close to the place of grading, he would not have discovered the trespasses alleged to have been committed. The petitioner also testified that at the time of his visit to the spot with Messrs. Sirrine, Wilson, and Watson, he was quite sure he had with him a plat of the lands, which he exhibited to the committee of school trustees; and that he could not have well pointed out any boundaries without reference to the plat. He positively denied that he agreed upon any "hedge row" as a southern boundary of the lands to be conveyed by him. As to the failure to make protest on the part of the petitioner, alleged by the respondents, Stone testified that soon after discovering the trespasses he protested thereabout to Mr. Sirrine, the chairman of the board, with whom he had transacted most of the business relating to the purchase and conveyance of the land, and that Mr. Sirrine promised to look into the matter.

We find in the record two other facts, very strongly depended upon by the petitioner to sustain his claim. These are: The erection of the schoolhouse in such location, so far as lot 31 is concerned, as to have it practically in the center of that lot, with reference to the frontage on Wilton Street. It is said that if the southern boundary had been as far down as contended for by the respondents, the natural thing would have been for the southern side of the school building to have extended much farther south. A privet hedge was planted along the line of Wilton Street in front of the schoolhouse from the corner of Randall and Wilton Streets to within four feet of the alley and no farther. While it is shown that this privet hedge was set out under the direction of ladies interested in the improvement of the school ground, the trustees knew of, and consented to, the same.

None of the trustees, with the exception of Mr. G. W. Sirrine, saw the deed executed and delivered by Stone until after the commencement of this suit. The record discloses.

that Mr. Sirrine was, not only in the matter of effecting the trade with Stone, but in all other ways pertaining to the school district, the most active member of the school board. All of the trustees, who testified, paid this departed worthy citizen the compliment of saying that he devoted much of his time to the affairs of the schools of Greenville, and at all times took a great interest in watching after their welfare. Mr. Sirrine, from the record here, while nearing seventy-five years of age, was mentally active and alert, and possessed acumen and sagacity in business affairs. It is not quite clear whether or not he had the deed prepared, but certainly it was delivered to him, and through his hands reached the public records. The respondents think that because in the name of the grantees the initials of Mr. Sirrine were incorrectly stated to be "W. G." instead of "G. W." that Mr. Sirrine had little to do with the preparation of the deed. This contention is answered by the petitioner with the assertion that this was a clerical error on the part of the scrivener.

Having the facts in mind, we turn to the legal principles applicable to them. We hardly deem it necessary to enter into a review of our many cases touching the subject of reformation of contracts. We think one quite recent case, cited as authority by both the petitioner and the respondents, sets forth clearly the law of this jurisdiction so far as we need to make inquiry in order to determine the questions we have before us. Speaking for this Court, Mr. Justice Cothran, in *Jumper v. Queen Mab Lumber Co.,* 115 S. C., 452, 106 S. E., 473, 475, stated succinctly well-recognized principles relating to reformation. We quote from his opinion:

"A contract may be reformed or rescinded, as the justice of the case may require, upon the ground of mistake, under these circumstances: (1) Where the mistake is mutual and is in reference to the facts, or supposed facts, upon which the contract is based; (2) where the mistake is mutual and consists in the omission or insertion of some material element affecting the subject-matter or the terms and stipula-

tions of the contract, inconsistent with those of the parol agreement which necessarily preceded it; (3) where the mistake is not mutual, but unilateral, and has been induced by the fraud, deceit, misrepresentation, concealment, or imposition in any form of the party opposed in interest to the reformation or rescission, without negligence on the part of the party claiming the right; (4) where the mistake is not mutual, but unilateral, and is accompanied by very strong and extraordinary circumstances, showing imbecility or something which would make it a great wrong to enforce the agreement, sustained by competent testimony of the clearest kind. *Kennerty v. Etiwan Co.,* 21 S. C., 226, 53 Am. Rep., 669; *Forrester v. Moon,* 100 S. C., 157, 84 S. E., 532.

"It thus appears that both the first and second conditions, instances of mutual mistake, are independent of the elements of misrepresentation and concealment."

We have not found in the record anything which brings this cause within subdivisions 1 or 2, since there is no evidence whatever that there was in the drawing and execution of the deed any "mutual mistake." Indeed, we do not find in the return of the respondents, where reformation of the instrument was asked, or in the argument submitted in their behalf, any claim that the petitioner and the school trustees were mutually mistaken as to the description of the lands set forth in the deed.

If the respondents are to obtain the relief to which they claim they are entitled, they must bring their cause within either subdivision 3 or 4, for the mistake, if any, was unilateral.

Does the evidence show that the mistake on the part of the school trustees was "induced by the fraud, deceit, misrepresentation, concealment, or imposition in any form" of the petitioner, "the party opposed in interest to the reformation * * * without negligence on the part of the" respondents? The first reason for a negative answer to this question is the fact that the respondents have

not plainly charged any fraud, deceit, misrepresentation, concealment, or imposition on the part of the petitioner. But if it should be held that their pleading or the evidence offered by them in a mild way charges such misconduct, we are clearly of the opinion that the charge has not been sustained. The plat of the Stone lands was on record, open to the inspection of all interested parties. The deed to the land was well drawn, and plainly expressed the intention of the grantor as to the lands he was conveying, and it not only referred to the plat, but gave the information where it was recorded. Evidently, the instrument was prepared by some one, not disclosed in the record, who was quite familiar with the drafting of legal papers, and who had before him the plat of the lands, and the deed was delivered to the chairman of the board of trustees, a gentleman of intelligence and character, who, in absence of a showing to the contrary, must have been satisfied that the school district was getting what it purchased. This gentleman, Mr. Sirrine, according to all the testimony, was not only trustworthy, but fully capable of taking care of the interest of the parties whom he represented. Again, if there was any imposition of any kind on the part of the petitioner —which we cannot from the evidence admit—there must have been some negligence on the part of those representing the school district, for surely it would have been very easy to have ascertained that the district was obtaining only about two-thirds of the frontage on Wilton Street, now claimed by the respondents to have been bought.

Have the respondents shown "by competent testimony of the clearest kind" such "strong and extraordinary circumstances, showing imbecility or something which would make it a great wrong to enforce the agreement"? Our answer to that question must also be in the negative. Of course, it would be out of place to even suggest any imbecility or weakness as to any of the parties who represented the school district as school trustees. We find nothing in the record to cause us to think that it would

be *a great wrong to enforce the agreement* contained in the deed.

In addition to the evidence already cited, we are impressed with the fact that it would not have been likely that the petitioner, intensely interested in the selling of his city lots, after they had been well planned and laid off, would have made the sale to the school trustees of the lands as claimed by them. A sale of that kind would have had the effect of closing entirely that part of the alley between lots 31 and 32. If the petitioner could have legally closed that part of the alley, it probably would have reduced the value of his other lots adjacent to the alley, for it is more than likely that the purchasers of those lots would have wished an alley entrance to their premises.

All the witnesses in the case appear to have been gentlemen of high integrity, and we fully believe that all of them were thoroughly honest in their recollection as to the occurrences which had taken place some years before. The confusion arose, no doubt, from a failure to properly understand the situation. The Stone land, which had been subdivided into city lots, was an old field which had not been cultivated for many years, and on which many bushes and trees had grown. The "hedge row" in the neighborhood of the lot, which some of the trustees had in mind, must not have been very well defined. We cannot understand how it extended only across lot 32 to the line of lot 34, owned by Mrs. Miller, a distance of only 131 feet. If the southern boundary was to be the "hedge row," and the "hedge row" extended all the way, then the school district would have purchased not only a parcel of lot 32, but parts of lots 34 and 36. The respondents do not claim any interest in lots 34 and 36 under the deed of Stone to them in 1923. As stated, those two lots were purchased later, 34 from Mrs. Miller and 36 from Stone.

Reviewing carefully all the evidence, we think the respondents failed to make out, as required by law, their claim for a reformation of the deed, and we are convinced that

there was error in the findings of fact of the Master and the Circuit Judge.

The respondents have cited as authority in support of their contention *Cooper v. McLaughlin*, 114 S. C., 332, 103 S. E., 523. This Court sustained an order reforming a deed in that case, where the vendor's agent pointed out to the purchaser certain lands to be included in the deed, which were not included according to the description contained in the deed. There are several distinctions between the facts of that case and those in the case at bar. The most important one, however, is this: The description of the deed in the *Cooper case* was a very general one. Here, the deed minutely and specifically described the lands conveyed. We cannot think that this case should be governed by the holding of the Court in the *Cooper case*.

The petitioner has raised several incidental questions, not necessary to be passed upon, since we hold with him on the main issue.

The judgment of the Court is that the decree of the Circuit Judge be, and the same is hereby, reversed.

MESSRS. JUSTICES COTHRAN, STABLER, CARTER and BONHAM concur.