13998

JUDSON MILLS v. NORRIS *ET AL.*

(179 S. E., 464)

2

12

16

18

*Messrs. Blythe & Bonham,* for appellants,

*Messrs. Haynsworth & Haynsworth,* for respondent, cite: *Partnership:*

February 11, 1935.

The opinion of the Court was delivered by Mr. W. C. COTHRAN, ACTING ASSOCIATE JUSTICE.

There is some conflict in the facts of this case, but in the main the facts are not seriously divergent and this opinion is based largely upon admitted facts. The difficulty arises as to the proper construction of those facts, the inferences to be drawn therefrom and the application of well-established principles of law to such facts and necessary inferences.

In the beginning, let it be fully understood that the controversy has arisen between Mr. B. E. Geer and Mr. D. L. Norris, both highly respected citizens of Greenville, and that no insinuation is intended to be cast upon the character of Mr. Geer in offering the stock for sale or upon the mental qualifications of Mr. Norris in accepting the offer. We prefer to say that it was a transaction intended to be governed by good faith, on the one part, and by business intelligence and confidence on the other. We will, therefore, make a very brief statement of the basis of the suit, refer to certain well-established principles of law, and then enlarge upon the facts as they appear from the transcript.

This Court has held, in 166 S. C., 422, 164 S. E., 919, that this suit is in equity and, therefore, the facts and the law are before us for determination, it being unnecessary to say that the decision at which we arrive will be final.

Shambow Shuttle Company, as its name would imply, a maker of shuttles for textile mills, was a corporation with plants at Greenville, S. C., and at Woonsocket, R. I. It had been in business for many years, first as a partnership and later as a corporation. Judson Mills of Greenville, S. C., of which Mr. Geer was president, was the owner of 3,000 shares and Mr. Geer owned, personally, 1,000 shares of Shambow Shuttle Company. Norris and Cox became interested in the purchase of the stock through one H. H. Ull-

man, then president of the company, Ullman then being in Greenville attending to certain business of the corporation. They were shown a financial statement of the affairs of the corporation, which showed that the capital stock of the company at a par value of $50.00 per share had a book value of $97.00 plus per share. Ullman said that the stock could be bought for par or a little above par. Norris and Cox were deeply interested and later followed up the subject of purchase with Mr. Geer. Ullman seems to now disappear entirely from the transaction. A later statement of the financial condition of the company, the one of December 31, 1926, was shown to Norris and Cox by Mr. Geer. This statement was not materially different from the statement shown by Ullman, the surplus and book values being approximately the same. Later Norris and Cox agreed to purchase the 3,000 shares of Judson Mills stock at $60.00 per share and gave their notes for same, as follows: Four notes for $20,000.00 each, payable in one, two, three, and four years, and one note for $100,000.00, payable in five years, all notes bearing 6 per cent. interest. Certain payments were made upon the notes as will hereinafter appear. In 1931 no payments were made on the notes and this suit was brought to recover the balance due thereon, with interest.

The defendants answered the complaint, alleging that they had been misled into purchasing the stock by the falsity of the statement of the financial condition of the company; that a fraud had been practiced upon them; that they relied upon the statements as being true; and that they would never have purchased the stock had they known the true financial condition of the company. They asked for a rescission of the contract of purchase and also counterclaimed for the amounts they had already paid.

The cause was referred to the Master for Greenville County to take the testimony and report same to the Circuit Court, no recommendations by the Master being ordered.

Upon the testimony submitted by the Master, the Circuit Judge rendered his decree in favor of the plaintiff, and from the judgment entered thereon, this appeal has been taken.

The law in regard to transactions of this nature has been definitely settled in this state by several decided cases, the leading ones not being mentioned in the circuit decree. Before going further into the facts of the case, we will set forth extracts from certain decisions which we think applicable to this appeal.

*Iler v. Jennings,* 87 S. C., 87, 68 S. E., 1041, 1044. In this case Iler bought certain stock from Jennings in Gambrell Hardware Company, Greenwood, S. C., of which company Jennings was a director. Jennings had no personal knowledge of the value of the stock and before the sale was made he suggested to Iler that Iler go the bookkeeper and get a statement of the financial condition of the company. This statement showed the stock to have a book value of $119.00 and upon this statement Iler bought the stock. Several months later the president of the company died and upon taking a new inventory it appeared that the president had, either through mistake or design, overvalued the inventory by $6,000.00. This reduction in the assets of the company reduced the book value of the stock to about $65.00 per share. Iler brought suit to recover what he had paid for the stock on the ground of breach of an express warranty contained in the statement as to the value of the stock. The Circuit Judge held that since Jennings, the seller, had no knowledge that the stock was not of the value represented by the statement furnished by the bookkeeper that there was no express warranty. In reversing the lower Court, this Court said: "Such use of a statement of the corporate business by a director negotiating a sale of his stock therein could not be regarded as other than a direct affirmation of its correctness, and, if was delivered for the purpose of assuring the buyer of the truth of the facts therein stated and to induce

him to purchase and the buyer purchases in reliance thereon, there is an express warranty."

Upon a second trial of the case, upon the same facts, the Circuit Judge directed a verdict for the plaintiff.

In affirming that judgment, the Court in Id., 93 S. C., 185, 188, 76 S. E., 276, said: "Upon the new trial, his Honor, Judge Gage, held that the evidence was susceptible of only one reasonable inference, to wit, that the statement was delivered for the purpose of assuring the plaintiff of the truth of the facts therein contained, and to induce him to purchase defendant's stock, and that plaintiff did buy the stock in reliance thereon. He therefore directed a verdict for plaintiff. The sole question is whether the evidence made any issue which should have been submitted to the jury. We agree with the Circuit Judge that it did not. ·*  *  *"

In the case of *Kimbrell et al. v. Taylor et al.,* 135 S. C., 321, 133 S. E., 829, 830, Mrs. Taylor sold her stock in Kimbrell Furniture Company under a contract containing this provision: "The foregoing sale is based on the statement heretofore given by the sellers to buyers, approximating assets $123,098.43, liabilities $26,022.55.  *  *  *" Thereafter the corporation was required to pay $3,902.81 federal income taxes, which should have been paid prior to the sale and transfer of the stock. The plaintiffs sued to recover this amount on the ground that this was a breach of the express warranty as to the liabilities of the corporation. Mrs. Taylor defended on the ground that she had no knowledge of this income tax matter, and that one of the purchasers of the stock, who worked for the company, was in better position to know the value of the stock than she. This Court, in sustaining a directed verdict for plaintiff, said: "The testimony bears out her claim in this respect. But since the appellant signed the written agreement, and it appearing that her execution of that paper was done fairly, freely, and honestly, she is, of course, bound by its terms."

And it was further held: "It seems clear that the language which we have quoted from the contract is an express warranty, so far as that language went."

Therefore, it was held that although Mrs. Taylor had no knowledge of the affairs of the corporation, or that the statement as to the value of the stock was not true, that having sold the stock upon express warranty she was nevertheless liable. The case of *Iler v. Jennings, supra,* is cited to sustain this principle.

*Steele, Receiver, v. Coleman,* 129 S. C., 158, 110 S. E., 836. This case holds that a representation as to the value of stock in a corporation is a representation as to a material fact and approves the doctrine of *Iler v. Jennings, supra,* to the effect "that any direct representation by a director of a corporation as to its financial status, with a view of inducing a stranger to buy its stock, and acted upon by the buyer, is an express warranty, whether the seller knew the facts were as represented or not."

Therefore, if the facts of the case bring it under these decisions, the defendants should prevail. As was said by the then Chief Justice Blease in the case of *Stone v. School District,* 161 S. C., 249, 159 S. E., 536, 538, "As briefly as we can, but with the due regard to our duty   *   *   *   we undertake a statement of the facts."

The November and December financial statements, especially the latter, upon which the defendants relied for true information before purchasing the stock, showed an inventory of $300,000.00, plant assets of $300,000.00, and a surplus account of approximately $188,000.00. This would give the stock at $50.00 per share a book value of something like $97.00 plus per share. Norris claims that this statement was false and misleading; that he did not know of it until 1931; that he had no way of knowing the true situation before that time; and that his determination to rescind the contract was formed as soon as he heard that he had been imposed upon in purchasing the stock. So,

then, the important question to be decided is as to the correctness of the financial statement, the testimony of the defendants that they bought the stock upon the verity of the statement not being denied. Under the law, as above pointed out, it makes no difference whether Mr. Geer knew of the incorrectness of the financial statement or not. If the statement proved to be materially wrong and the defendants relied upon it to their injury, then they should be relieved of liability upon the ground that the statement furnished them constituted an express warranty. We will, therefore, endeavor to give a comprehensive version of the facts as pertaining to the express warranty as shown in the financial statement, disregarding all allegations of either actual or constructive fraud on the part of Mr. Geer.

We have given an outline of the facts leading up to the sale paying especial attention to the financial statement. In March, 1931, there was sent to Norris the annual statement of the company for the year 1930. Upon a careful study of this report Norris discovered that the inventory amount had been reduced $68,000.00 because of obsolete items and he at once thought that this reduction was unreasonable unless the inventory account was unsound as it appeared in the statement furnished at the time of the purchase of the stock. The testimony shows that Norris then wrote a letter to Mr. M. J. Offers, treasurer of the company, for an explanation of this reduction of inventory and Offers replied that this reduction was made because of obsolete items which had accumulated over a long period of years and that the new inventory was more representative of true, actual value than it had ever been before. The record further shows that Mr. Ralph L. Greene, who had served the company in various capacities for many years and who had every opportunity to know the inventory before and after 1926, testified that practically all of the items charged out of the inventory were obsolete prior to 1926 and should have been charged out prior to that time. It would thus

appear that the inventory account of upwards of $300,000.00, as appeared by the statement, was approximately $68,000.00 too much. This would seem sufficient under the decisions heretofore set out to warrant a rescission of the contract, but this is not all.

Testimony was taken at Greenville and at Woonsocket, R. I. At the latter place, the defendants demanded statements or audits of the company for all years prior to 1926. The audits for 1921, the year the company was organized, and for 1924, were missing. There was an audit produced for the first six months of 1923 which gave a rather full history of the partnership and of the corporation, together with a full report of the business after incorporation. All of these records were given to Mr. W. C. Rion, an auditor of recognized ability, then living in Columbia but now deceased. His investigations of the records revealed many facts which did not appear in the statement of December 31, 1926, the statement upon which the stock was bought and sold.

Mr. Rion found that prior to 1921 the business was conducted as a partnership and that John Shambow was the sole owner. In 1921 the business was incorporated and John Shambow owned all of the capital stock. At this time John Shambow appreciated the assets of the company over the valuation of 1920 by $145,800.00 desregarding the fact that some of the properties had been purchased prior to March 1, 1913. It is needless to speculate upon his reason for thus disregarding the method of valuation as provided in the federal income tax law. With this appreciated value, John Shambow turned over the partnership properties to the corporation as having a net worth of $441,391.58 and issued to himself 6,000 shares of stock of no par value. It is also needless to inquire as to his reasons for so doing in the face of the following provision of the internal revenue Act: "Title 26, § 2112. Recognition of Gain or Loss. * * * (b) * * * (5) Transfer to corporation

controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation."

However, it would appear that this appreciation of the assets and the transfer from the partnership to the corporation enhanced his assets by the sum of $145,800.00. These facts are not very material to the issue for the reason that John Shambow was not directly connected with the company at the time of the sale to Norris. They are more historical than material, although they reflect an overvaluation of the properties even before Judson Mills or Norris and Cox became interested in the corporation.

Mr. Geer bought into the corporation for Judson Mills in the fall of 1922. In 1921 the company had lost about $48,000.00 and had made a small profit of $1,100.00 in 1922, a loss of about $47,000.00 for the two years. For $150,000.00 actually paid, Judson Mills received $150,000.-00 of 7 per cent. preferred stock and about one-half of the 6,000 shares of no par value common stock. The question arose as to whether or not interest could be paid on the preferred stock when there was an outstanding deficit and the problem was solved in a most novel, not to say unique, manner. How simple it was, and how satisfactory! The 6,000 shares of no par value stock which had an arbitrary valuation of $441,391.58 were exchanged for 6,000 shares of stock of a par value of $50.00 per share, or $300,000.00 worth of stock. The difference between the value of the no par value stock, $441,391.58, and the par value stock, $300,-000.00, or $141,391.58, was credited to surplus and the deficit was no longer apparent. Without a dollar of new money, either in cash or its equivalent, being added to the corporation, it was made to appear that there was no deficit but instead a very material surplus. The true situation, as shown by Mr. Rion, was that even with this manipulation

there should have been a deficit of $4,408.42 or the difference between the improper appreciation of the fixed assets of $145,800.00 and the newly created surplus of $141,391.58.

The statement furnished Norris showed a surplus account of some $188,000.00 and we have endeavored to show in the preceding paragraph how the greater part of this surplus originated. Following it further, we find that in December, 1923, the 6,000 shares of par value stock were increased to 7,000 shares and the additional 1,000 shares were shown to have been sold for $40,000.00, a discount of $10,000.00 which was charged to the surplus account. In 1924 it appears that this additional issue of 1,000 shares was canceled. When the cancellation took place, the surplus account was credited with the value thereof, or $50,000.00. Having been charged with the discount of $10,000.00, this left a net gain to the surplus account of $40,000.00. It is not stated who was the "good angel" who bought this stock for $40,000.00 in December, 1923, and donated it to the company in 1924. The effect of this was to once more increase the surplus account, this time by $40,000.00, and yet there was no increase in the assets.

But there is yet more to be said in regard to the surplus account. When Judson Mills bought $150,000.00 of preferred stock, there had been issued preferred stock to the extent of $200,000.00, $50,000.00 having been given to John Shambow for his equity in the corporation. This $50,-000.00 item was not charged to the surplus account, as Mr. Rion says it should have been, but was probably charged to the plant account. At any rate, it constituted a burden of $50,000.00 which had to be carried by the corporation and which nowhere appeared in any statement. This should have been another charge against the surplus account but was not so charged, nor did it appear in the financial statement of the corporation submitted to Norris at the time of the purchase, that financial statement being the express warranty of the true condition of the corporation.

Another stock change was made due to losses sustained by the corporation. The Greenville plant had sustained a loss of $218,000.00 in 1924, and over a four-year period the Woonsocket plant had lost upwards of $70,000.00. John Shambow had been "gotten out of the picture," as Mr. Geer describes it, and Mr. Geer was at the head of the company. A reorganization appeared necessary and the following plan was adopted: Mr. Geer surrendered the full amount of the common stock, 6,000 shares at $50.00 per share, $300,000.00, and credited this amount to surplus thereby wiping out the deficit. He also surrendered the $200,000.00 of preferred stock, for which he issued 4,000 shares of new common stock, Judson Mills receiving 3,000 shares of this stock and Mr. Geer receiving, personally, 1,000 shares. His 1,000 shares, valued at $50,000.00, represented the amount he had personally paid John Shambow. The stock purchased by the defendants was from this last issue. New preferred stock of $200,000.00 was issued as a result of this last reorganization and was sold at a discount of $50,000.00.

It is further shown by the testimony of Mr. Rion that from the period of organization in 1921 up to the time the defendants bought in 1927 there had been surrendered $491,391.58 of common stock which had been credited to surplus. It is also shown that throughout the life of the corporation, from 1921 through 1926, the total losses were over $245,000.00, this item of loss not appearing in any statement.

The surplus account, shown in the statement, was calculated to make a would-be purchaser believe that the sum of $188,000.00 was earned surplus, no explanation being given as to its character. According to Mr. Rion, it is the practice of all first-class accountants to "earmark" a surplus when it is other than an earned surplus, and this was not done in the statement of 1926.

With the facts as above set forth, we proceed to consider the two following grounds of appeal as relied upon by the

appellants (the ground alleging fraud in the sale of the stock not being further considered for the reason before stated):

(1) Breach of warranty in the sale and (2) laches of the defendants in seeking rescission of the contract. The Circuit Judge disregarded the question most seriously presented by the appellants whereby they claimed that the statement upon which they purchased constituted an express warrranty. He held, and cited numerous authorities to sustain his holding, that the law governing the sale of tangibles was the only law applicable and he did not refer to the cases hereinbefore cited. Following this idea, he held that it was the duty of the purchaser to inspect within a reasonable time to discover defects or that the defects would be waived. We do not think this is the correct principle of law applicable to this case. We do think that the authorities hereinafter cited must govern and to that end we will look further into the facts to determine whether or not there was a breach of an express warranty.

We have heretofore made mention of the testimony of Mr. Offers and of Mr. Greene relative to the surplus account. In reply to this testimony, plaintiff offered as witnesses Mr. P. D. Phillips and Mr. J. A. Murphy. The former had been president of the company for only about four months when the inventory changes were made and knew very little of importance relative to the inventory. His information was gathered largely from Mr. Murphy, the sales manager, and others. The testimony of Mr. Murphy, however, is of more importance.

He testified that in 1929, when the depression hit the country, many cotton mills, which were the customers of Shambow Shuttle Company, changed from old fashioned looms to automatic looms, or went out of business. As a result of this, the company had left on hand a large stock of shuttles which had little or no value. All this came about in 1929 and 1930, he said, and created the obsolescence in the inventory.

But the inadequacy of Mr. Murphy's explanation lies in the fact that he also testified that since 1926 his company had filled but few orders for shuttles that were not firm orders; and that on such orders the company had lost but a few hundred dollars. He explained that on such firm orders the Shambow Shuttle Company would make up a large supply of shuttles for a mill, which were held on call for the mill for a year, at the end of which time the shuttles would be shipped and the mill would have to pay for them. Thus it would seem that the company not only had not sustained a great loss on these contracts; and that in the circumstances in which the sale of shuttles was made there could be no great accumulation of rejected shuttles. While no doubt through this period there was a shrinkage of inventory values, this would only make the inventory less valuable, but not obsolete.

Mr. Murphy attempted to fortify this testimony by giving a list of shuttles taken from the 1926 itemized inventory, which shuttles were listed at small or conservative value. This, he said, showed that due allowance had been made for obsolescence in 1926. But Mr. Norris pointed out in his testimony that no accurate understanding as to whether or not an article was obsolete could be arrived at by the value at which it was listed on one particular inventory. It might have been carried at the same value for years before and it might be so carried for years thereafter. Therefore, unless the inventories prior to 1926 and those taken thereafter were available, no definite conclusion could be reached as to whether or not allowance had been made for obsolescence on these items.

It is significant that defendant's counsel made demand upon plaintiff's counsel for all the inventories from 1921 to 1930, both years inclusive. Plaintiff's counsel replied by saying that Mr. Offers could not find the inventories prior to 1926, and that those for the succeeding years were considered by plaintiff's counsel to be utterly irrelevant. But

were they irrelevant? If it appeared by the inventories that this same list of shuttles to which Mr. Murphy referred had been carried at the same values before 1926, and from 1926 to 1930, this would strongly corroborate Mr. Offers' conclusion that the big charge off in 1930 was of obsolete items which had accumulated over a long period of years. It is held in the case of *Willcox, Ives & Co. v. Jeffcoat,* 135 S. C., 149, 133 S. E., 463, 464, that "the failure or refusal of a party to produce evidence peculiarly within his knowledge and control, which would have an important bearing upon the facts in dispute, warrants the inference that it would be unfavorable to his contention." And in *Smith v. Sou. Ry. Co.,* 121 S. C., 94, 113 S. E., 465, 466, it is said: "All of this information was necessarily in the power of the plaintiff to furnish; the presumption is that having it and not producing it, the information was to his detriment."

We think the evidence is conclusive of the fact that the inventory was unsound in 1926, before the defendants purchased the stock, and the Circuit Judge was in error in not so holding.

In our opinion, there was error on the part of the Circuit Judge in holding that there was no element of misrepresentation or breach of warranty in regard to the surplus account of about $188,000.00 appearing on the statement upon which the stock was sold. He apparently overlooked the fact that nearly half a million dollars worth of common stock, to be exact $491,391.58, had been surrendered in order that a surplus from time to time might be created and that no mention whatsoever of this fact was made upon the statement upon which the trade for the stock was consummated. Again he concluded that the sale of $150,000.00 of preferred stock, made after the last reorganization, was credited to surplus and thereby constituted real assets. Such could not be the case for two reasons: (1) The additional preferred stock was an additional liability and could not be considered a surplus; capital stock, whether

common or preferred, of a fixed par value, is always a liability of the corporation; and (2) this sale of preferred stock was at a discount of $50,000.00 and this discount was charged to the surplus account, thereby reducing it to that extent.

For even a stronger reason, the showing as to surplus on the statement of December 31, 1926, was misleading, the proof showing that no surplus of any nature existed. We have heretofore shown that the surplus account was credited with $141,391.58 at the time the no par value stock was changed to par value stock and that this credit was not justified because the net worth of the corporation was appreciated to the extent of $145,800.00. The surplus account was also credited with $40,000.00 on the alleged sale of 1,000 shares of common stock. Surplus was not charged with the amount of $50,000.00 donated to John Shambow as it should have been since this gift to Shambow was equivalent to a discount of the stock. These three items, to wit, $145,800.00, $40,000.00, and $50,000.00, total $235,-800.00, and its readily seen that if these items had been charged to surplus as they should have been the doubtful surplus of $188,466.59 is completely destroyed, leaving a deficit of $47,333.41. The statement of December 31, 1926, should have shown this deficit, and in failing to do so the value of the assets of the corporation was misrepresented to the extent of $235,800.00. It seems hardly necessary to say that this constituted a misrepresentation of a most material fact and it is fair to say that the defendants, had they known of it, would never have purchased the stock.

Error is charged to the Circuit Judge in not holding that the statement was false because it did not show that the company had sustained total losses of $245,-000.00. This statement of losses, according to the undisputed testimony of Mr. Rion, is true, but we cannot say that there was error in not including this in the statement submitted to the defendants. Such a statement was not intended to

cover the entire history of the corporation but was intended to be, and was, an express warranty of its financial condition at the time of the sale.

The defendants further charged error on the part of the Circuit Judge in holding that at the time of the sale the stock had a book value of $97.00 plus per share. This error on the part of the Circuit Judge is the result of his other findings and, if they had been correct, the conclusion as to the value of the stock found by him would have been inevitable. We have endeavored to show the facts upon a different basis than was found by the Circuit Judge and, hence, his conclusion as to the value of the stock being in complete variance to what we have found, is of necessity an erroneous finding.

It, therefore, appearing that the defendants have sustained by the evidence the points covered by the exceptions; and it appearing that the statement upon which the sale was made was, under the law of this State, an express warranty; and it appearing that the statement was untrue in material particulars, thereby inducing the defendants to enter into the contract of purchase; and it appearing that the defendants were induced to purchase the stock by reason of misleading statements, it is clear that they are entitled to a rescission of the contract of sale and a recovery by them of the amount paid upon the notes, unless they are precluded from same by reason of their delay in asserting their rights and, as to this point, our attention will now be directed.

It is urged by the plaintiff that the defendants were in control of the business, that they had made several visits to the plant at Woonsocket, and that they should have discovered the alleged misrepresentation sooner than they did in order to derive any benefit therefrom. The defendants could not discover defects in the inventory such as appreciated values or correctness of surplus account by a visit to the plant in Woonsocket. They had a right to rely upon

the statement as an express warranty of the financial condition of the company and these statements did not show or in any way indicate that there was any misrepresentation until the report for the year 1930 which was received in March, 1931. Prompt notice was then given by the defendents of their intention to rescind the contract. It is appropriate here to say that all evidence with respect to the surplus, the stock changes, the plant values, and everything except the inventory reduction was not revealed until after the suit was brought and the records of the company carefully examined after being introduced in evidence.

We, therefore, see no reason to hold that the defendants be estopped by laches from claiming a rescission of the contract, they having acted promptly upon their first intimation that the statement upon which they purchased the stock was misleading.

For the reasons stated in this opinion, the decree and judgment of the Court below are reversed and the cause is remanded to that Court with instructions to enter a decree dismissing the complaint with costs and awarding judgment in favor of the defendants herein for the amounts paid by each of them on the notes sued upon, together with interest at the legal rate from the dates of such payments. The payments admittedly made are as follows:

By J. D. Cox:

| | |
|---|---|
| January 1, 1928 | $ 15,400.00 |
| January 1, 1929 | 14,800.00 |
| January 1, 1930 | 14,200.00 |
| Total | $ 44,400.00 |

By D. L. Norris:

| | |
|---|---|
| January 1, 1928 | $ 15,400.00 |
| January 1, 1929 | 14,800.00 |
| May 20, 1930 | 4,200.00 |
| Total | $ 34,400.00 |

Reversed with directions.

Messrs. Justices Stabler and Bonham and Mr. Acting Associate Justice Eugene S. Blease concur.

Mr. Justice Carter dissents.

Mr. Justice Carter (dissenting) : Being unable to agree with the conclusion reached in the leading opinion in this case, I most respectfully dissent. The facts and issues involved in the case are clearly set forth in the decree of Judge J. Henry Johnson who heard the case on the Circuit, and, after a careful study of the record in the case, it is my opinion that the evidence amply supports the finding, holding, and conclusion reached by his Honor, and for the reasons stated by Judge Johnson, as set forth in the decree issued by his Honor in the case, I think the said decree and judgment thereon should be affirmed.